# Exhibit A



**VIA FEDERAL EXPRESS**
Eric F. Stein and/or FOIA Officer
Director, Office of Information Program and Services
United States Department of State
Building SA-2
515 2nd Street, NW
Washington, D.C. 20522-8100

**Re: Request Under Freedom of Information Act (Expedited Processing and Fee Waiver)**

To Whom It May Concern:

The National Iranian American Council (NIAC) submits this Freedom of Information Act ("FOIA") request ("Request") for all records regarding President Trump's "extreme vetting" standards – better known as "Supplemental Questions for Visa Applicants" – and its implementation by the United States Department of State. Pursuant to FOIA, 5 U.S.C. § 552 *et seq.* and relevant regulations, *see* 22 C.F.R. § 171 *et seq.*, NIAC seeks information providing definite guidelines that explain these "extreme vetting" standards and provide clarity regarding its repercussions.

## I. Background

On January 27, 2017, President Donald J. Trump signed an executive order entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States," that among other restrictions, suspended the entry of individuals from seven Muslim-majority countries to enter the United States for a period of 90 days including Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen.[1] Following impassioned protests across the country, lawyers representing affected individuals and families were able to secure injunctions in five federal courts within the following 24 hours.[2]

On March 6, 2107, President Trump released a revised version of the executive order, which rescinded and replaced the first executive order[3]. Even with its minor adjustments, removing the exception for Christians and preserving the rights of dual nationals from the respective states, the travel ban continued to target the Iranian and Muslim population by imposing discriminatory additional layers of scrutiny. Once again,

---

[1] Exec. Order No. 13769, 82 Fed. Reg. 8977 (Feb. 1, 2017).
[2] *See, e.g.*, Steve Vladeck, *The Airport Cases: What Happened, and What's Next?*, JUST SECURITY, Jan. 30, 2017, *available at* https://www.justsecurity.org/36960/stock-weekends-district-court-orders-immigration-eo/.
[3] Exec. Order No. 13780, 82 Fed. Reg. 13209 (Mar. 9, 2017).

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



the Courts issued nationwide injunctions against the revised executive order, which remain in effect as of the date of this request[4].

As the embattled executive order is currently being appealed to the Supreme Court by the Department of Justice, President Trump and the administration have turned their attention to achieving the underlying goals of the enjoined executive order through alternative administrative measures. More specifically, the Trump administration has begun the 'extreme vetting' of visa applicants.

Throughout the month of March, Secretary of State Rex Tillerson sent a series of four internal cables to embassies and consulate offices overseas. On March 10, Tillerson sent a cable entitled "Guidance to Visa-Issuing Posts,"[5] and another cable entitled "Implementing Immediate Heightened Screening and Vetting of Visa Applications"[6] sent on March 15, 2017.

Following nationwide preliminary injunctions freezing implementation of the President's revised executive order from U.S. District Court judges in Hawaii and Maryland on March 16, Tillerson sent another cable the same day entitled "Halt Implementation."[7] The next day he sent another cable entitled "Implementing Immediate Heightened Screening and Vetting of Visa Applications."[8]

This fourth cable sent March 17 carefully removed and maneuvered around the sections from the March 15th cable that were unapproved by the White House Office of Management and Budget (OMB).[9] The new instructions' vague language called for consular chiefs in their respective diplomatic posts to organize a group of legal and intelligence officials with the aim of developing "a list of criteria identifying sets of post applicant populations warranting increased scrutiny."[10]

Although the cables following the court decisions directed embassies and consular officials to disregard the "extreme vetting" until approved by OMB, visa applicants from the six Muslim-majority countries listed in the executive order, however, would still be subject to inter-agency background checks under the mandatory Security Advisory

---

[4] Ann E. Marimow and Robert Barnes, *Federal Appeals Court Maintains Freeze of Trump's Travel Ban. Attorney General Vows Supreme Court Appeal*, WASH. POST, May 25, 2017, *available at* https://www.washingtonpost.com/local/public-safety/federal-appeals-court-largely-maintains-freeze-of-trumps-travel-ban/2017/05/25/395aa394-365b-11e7-b4ee-434b6d506b37_story.html?utm_term=.a28363999f40

[5] *Guidance to Visa-Issuing Posts*, U.S. DEPARTMENT OF STATE (Mar. 23, 2017), *available at* http://live.reuters.com/Event/Live_US_Politics/791235253.

[6] *Implementing Immediate Heightened Screening and Vetting of Visa Applications*, U.S. DEPARTMENT OF STATE (Mar. 23, 2017), *available at* http://live.reuters.com/Event/Live_US_Politics/791246151.

[7] *Halt Implementation*, U.S. DEPARTMENT OF STATE (Mar. 23, 2017), *available at* http://live.reuters.com/Event/Live_US_Politics/791249837.

[8] *Supra* note 6.

[9] *Id*.

[10] *Id*.

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



Opinion (SAO) provision which could significantly delay the visa process by many months.[11]

On May 4, the State Department submitted for approval the "extreme vetting" policy proposal. An emergency approval request was sent to the Office of Management and Budget (OMB), in which the State Department has indicated a new round of questions for individuals "who have been determined to warrant additional scrutiny in connection with terrorism or other national security-related visa ineligibilities."[12] Although the request states that visa applicants will not be "denied on the basis of race, religion, ethnicity, national origin, political views, genders or sexual orientation," it directly states that the "information collection implements the directive of the President" released on March 6, the same day as the Second Executive Order.[13]

Under the expedited emergency review process that deprived the general public of the opportunity to make fully informed public comments, May 18 was the last day to submit public comments on the extreme vetting proposal and on May 23 the request was approved by the OMB.[14] The guidelines of the extreme vetting procedure remain unclear but immigration attorneys anticipate that these extensive measures will continue to significantly slow down and disrupt the visa issuance process for thousands of applicants, and disproportionately affect Iranian Americans seeking visas.[15] Visa officials have already begun collecting the requested information on U.S. Department of State DS-5535 forms.

Already, even prior to the U.S. Department of State's "Supplemental Questions for Visa Applicants" policy on May 4, 2017, there has been a drastic decrease in visa issuance to nationals of countries targeted in the visa ban since the executive orders.[16] Visas to the six countries in the revised executive order were down by 55% compared to 2016; this includes a 52% drop in Iranian visas and a 68% drop in Somali visas.[17] While Iraqis were removed from the Second Executive Order ban, the initial effects still lead to a drop of nearly half the number of non-immigrant visas issued.[18]

---

[11] *See also,* Arshad Mohammed, Mica Rosenberg and Yeganeh Torbati, *Exclusive: U.S. Embassies Ordered to Identify Population Groups for Tougher Visa Screening*, REUTERS, March 23, 2017, *available at* http://www.reuters.com/article/us-usa-immigration-visas-exclusive-idUSKBN16U12X.
[12] *Id.*
[13] Dept. of State. Notice of Information Collection Under OMB Emergency Review: Supplemental Questions for Visa Applicants. 82 Fed. Reg. 20956 (May 4, 2017).
[14] Mica Rosenberg and Yeganeh Torbati, *State Dept. Seeks Tougher Visa Scrutiny, Including Social Media Checks*, REUTERS, May 4, 2017, *available at* http://www.reuters.com/article/us-usa-immigration-visa-idUSKBN18020A.
[15] *Id.*
[16] Yeganeh Torbati, *Number of U.S. Visas to Citizens of Trump Travel Ban Nation Drops,* REUTERS, April 27, 2017, *available at* http://www.reuters.com/article/us-usa-immigration-visas-analysis-idUSKBN17T34G.
[17] Lucy Westcott, *U.S. Visas for Muslim-Majority Countries Down 20 Percent Under Trump*, NEWSWEEK, May 26, 2017, *available at* http://www.newsweek.com/nonimmigrant-visas-usa-travel-ban-trump-616316
[18] *Id.*

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



Most recently, during the Senate Homeland Security and Government Affairs Committee hearing on the Fiscal Year 2018 Budget Request for the Department of Homeland Security, Secretary of Homeland Security John Kelly again dismissed concerns on the "Muslim ban" and reaffirmed the need for additional interview questions and social media access from isolated, minority populations.[19] Secretary Kelly claimed these measures were in the national security interests of the United States, and again made references to majority-Muslim countries listed on the visa ban as threats.

During the same hearing, Senator Rand Paul, and others, expressed their concern for the lack of guidelines regarding the vetting process, the grave invasion of privacy and the discriminatory filtering of targeted populations.[20]

Through this request for information, NIAC hopes to be better able to ensure that rights of the afflicted communities, particularly Iranian and Iranian-Americans, are protected and that its audience is well informed as to federal government activity and other matters of public interest.

## II. Requested Records

For the purposes of this Request, the term "Records" collectively means "any information" that qualifies under 5 U.S.C. § 552(f), and includes but is not limited to, the original or any full, complete and unedited copy of the following: charts; lists; logs; text communications between mobile phones or other electronic devices (including, but not limited to, communications sent via SMS or other mobile text, Blackberry Messenger, iMessage, instant messaging, WhatsApp, Signal, Telegram, Gchat, Facebook Messenger, Twitter direct message, or Instagram direct message), internal cables, and all relevant communications created, stored, received or delivered in any electronic or digital format. The term "Records" also includes, but is not limited to, e-mails (whether located on a government or *private account* or server consistent with the holding of *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145 (D.C. Cir. 2016) (rejecting agency argument that emails on private email accounts were not under agency control); still images, video or audio recorded on cell phones or other electronic devices; voicemail messages; social-media posts; instructions; directives; cables; guidance and documents; formal and informal presentations; Powerpoint presentations; training documents; bulletins; alerts; updates; advisories; reports; legal and policy memoranda; handouts; transcripts; contracts or agreements; minutes or notes of meeting and phone calls; and memoranda of understanding.

For the purposes of this Request, the term "briefing" includes, but is not limited to, any meeting, teleconference, electronic communication, or other means of gathering or communicating by which information was conveyed to one or more persons.

---

[19] Homeland Security Fiscal Year 2018 Budget. C-SPAN. June 6, 2017, *available at* https://www.c-span.org/video/?429383-1/secretary-kelly-travel-ban-injunctions-hobbling-homeland-security-screening-effort.
[20] *Id*.

1411 K Street NW  
Suite 250  
Washington, DC 20005

Tel: (202) 386-6325  
info@niacouncil.org  
www.niacouncil.org



For the purposes of this Request, the term "State Department official" includes, but is not limited to, any person who is (1) employed by or on behalf of the U.S. Department of State, Bureau of Consular Affairs or U.S. Department of Homeland Security in any capacity; (2) contracted for services by or on behalf of the U.S. Department of State, Bureau of Consular Affairs, or U.S. Department of Homeland Security in any capacity; (3) appointed by the President of the United States to serve in any capacity at the U.S. Department of State, Bureau of Consular Affairs or U.S. Department of Homeland Security, all without regard to the component or office in which that person serves.

**For the purposes of this Request, and unless otherwise indicated, the timeframe of records requested herein is March 1, 2017 to the date this Request is processed.**

Pursuant to FOIA, 5 U.S.C. § 552, NIAC hereby requests release of the following:

1. Records created on or after March 1, 2017 concerning the U.S. Department of State's interpretation, enforcement, implementation and effects of the following, at all visa-issuing diplomatic and consular posts:

    a. May 4, 2017 State Department notice of request for emergency Office of Management and Budget (OMB) approval, OMB control number 1405-0226, DS-5535, docket number DOS-2017-0019 of "Supplemental Questions for Visa Applicants" policy

    b. May 23, 2017 OMB approval of State Department May 4, 2017 request for emergency OMB approval of the "Supplemental Questions for Visa Applicants" policy proposal

    c. March 10, 2017 internal cable sent from Secretary of State Rex Tillerson to visa-issuing posts entitled "Guidance to Visa-Issuing Posts"

    d. March 15, 2017 internal cable sent from Secretary of State Rex Tillerson to visa-issuing posts entitled "Implementing Immediate Heightened Screening and Vetting of Visa Applications"

    e. March 16, 2017 internal cable sent from Secretary of State Rex Tillerson to visa-issuing posts entitled "Halt Implementation"

    f. March 17, 2017 internal cable sent from Secretary of State Rex Tillerson to visa-issuing posts entitled "Implementing Immediate Heightened Screening and Vetting of Visa Applications"

2. Records concerning the number of visa applicants who were subjected to the

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



May 4, 2017 U.S. Department of State "Supplemental Questions for Visa Applicants" policy or required to submit form DS-5535, including:

a. Records concerning the total number and percentage of visa applicants from Iran, Iraq, Syria, Sudan, Libya, Somalia, and Yemen who were subjected to Security Advisory Opinions (SAO) screening

b. Records concerning the total number and percentage of visa applicants from Iran, Iraq, Syria, Sudan, Libya, Somalia, and Yemen whose visa applications were rejected under the May 4, 2017 "Supplemental Questions for Visa Applicants" policy or form DS-5535, and whether such rejections where based on potential national security risks

c. Records concerning the total number and percentage of visa applicants from Iran, Iraq, Syria, Sudan, Libya, Somalia, and Yemen who were requested by visa officials to provide travel history as well as supporting financial documentation evidencing the source of funds for all domestic and international travel for the past fifteen (15) years in accordance with the May 4, 2017 "Supplemental Questions for Visa Applicants" policy, or form DS-5535

d. Records concerning the total number and percentage of visa applicants from Iran, Iraq, Syria, Sudan, Libya, Somalia, and Yemen who were requested by visa officials to provide social-media identifiers, platforms, pages, posting, passwords or other information pertaining to social media accounts held by the visa applicant, in accordance with the May 4, 2017 "Supplemental Questions for Visa Applicants" policy, or form DS-5535

e. Records concerning any guidance, criterion, standards, benchmarks, or other canons utilized in evaluating visa-applicants' social media postings in assessing whether the individual poses a potential national security threat in accordance with the Department of State's May 4, 2017 "Supplemental Questions for Visa Applicants" policy, or form DS-5535

f. Records concerning the interpretation, implementation, and enforcement of the U.S. Department of State's May 4, 2017 "Supplemental Questions for Visa Applicants" policy, or form DS-5535

g. Records concerning training or guidance provided to visa officers or other State Department officials concerning the enforcement of the May 4, 2017 "Supplemental Questions for Visa Applicants" policy, or form DS-5535

**To reiterate: NIAC seeks information regarding the State Department and visa-issuing post's interpretation and enforcement of the "extreme vetting" or "Supplemental Questions for Visa Applicants" policy, not information held in the records of State Department Headquarters.** More specifically, NIAC seeks records

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org

Case 1:18-cv-00868-RDM   Document 1-5   Filed 04/13/18   Page 8 of 13



held by State Department employees and field offices abroad, including but not limited to visa-issuing posts, consular offices, and embassies. The U.S. Department of State has an obligation to search all such field offices that are reasonably expected to produce any relevant information.[21] The records requested are not publicly available National Archives and Records Administration or public libraries, and is generally absent from the public domain, given how recently the "extreme vetting" policy was approved.

    NIAC requests that searches of all electronic and paper/manual indices, filing systems, and locations for any and all records relating or referring to the subject of our Requests be conducted. Given the expedited timeline on which the relevant events and interpretations occurred, this incudes the personal email accounts and work phones of all employees and former employees who may have sent or received emails or text messages regarding the subject matter of this Request, as well as institutional, shared, group, duty, task force, and all other joint and/or multi-user email accounts and work phones which may have been utilized by each such employee or former employee. Additionally, for each relevant email account identified, all storage areas must be searched, including the inbox "folder" and all subfolders, sent folder, deleted folder, and all relevant archive files.

    If any records responsive or potentially responsive to the Request have been destroyed, our Request includes, but is not limited to, any and all records relating or referring to the destruction of those records. This includes, but is not limited to, any and all records relating or referring to the events leading to the destruction of those records.

    As required by the relevant case law, the agency should follow any leads it discovers during the conduct of its searches and should perform additional searches when said leads indicate that records may be located in another system. Failure to follow clear leads is a violation of FOIA.

    With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), NIAC requests that responsive electronic records be provided electronically in their native file format, if possible. Alternatively, we request that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate Bates-stamped files.

### III. Request for Expedited Processing

    NIAC requests expedited processing of this Request pursuant to 5 U.S.C. § 552(a)(6)(E). NIAC is a non-profit public interest group primarily engaged in

---

[21] *See, e.g., Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990); *Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978) (agency not required to search all of its field offices because request did not ask for a search beyond the agency's central files); *see also Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 230 (D.D.C. 2013).

1411 K Street NW    Tel: (202) 386-6325
Suite 250    info@niacouncil.org
Washington, DC 20005    www.niacouncil.org



disseminating information and "inform[ing] the public concerning actual or alleged Federal Government activity" and the information is "urgent[ly] needed by NIAC.[22]

NIAC is a nonpartisan, not-for-profit 501(c)(3) organization and is the largest organization representing Iranian-Americans in the country. NIAC's mission is to strengthen the voice of Iranian Americans by promoting greater understating between the Iranian and American people, and seeks to advance the interests of the Iranian-American community on civic, cultural and political issues. NIAC defends Iranian-American interests against corporate and media bias, discrimination, and government neglect; and monitors and shapes national legislation affecting Iranian Americans.

A.   *NIAC is a representative of the news media within the meaning of the statute and the records requested are not for commercial use*

The primary activities of NIAC include gathering news, facts and information about government activity, analyzing that information, and broadcasting that information or news to the general public, membership, and the press.[23] A non-profit public interests group which "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" has been found to be "primarily engaged in disseminating information" for the purpose of the statute.[24]

Though it is not its sole professional activity, NIAC's primary professional activity is information dissemination. To that end, NIAC reaches a vast audience through a variety of media outlets, including a web page, radio, television, press releases, and direct mailings. NIAC also regularly publishes a weekly newsletter – distributed to about 22,000 self-declared members as well as a list of about 60,000 e-mail and mailing addresses – containing descriptions and analysis of information and government activity. NIAC's President, Trita Parsi, regularly appears on broadcast outlets including CNN and MSNBC, as well as appearing regularly in the nation's top newspapers, in print and online editions, including *Washington Post* and *New York Times*.

NIAC also publishes and distributes mailings, broadcasts information and analysis of government activity to social-media followers, and maintains a website and blog that contain updates about advocacy work, litigation effort, breaking news, and analysis of government activity.[25] NIAC also regularly holds congressional briefings, educational events, and regularly issues press releases to call attention to government activity and

---

[22] 5 U.S.C. § 552(a)(6)(E)(v)(II).
[23] NIAC is "primarily engaged in disseminating information" within the meaning of 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 22 C.F.R. § 171.11(o).
[24] *See ACLU v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004)
[25] National Iranian American Council, *NIAC | National Iranian American Council*, https://www.niacouncil.org.

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



other breaking news.[26] Members of NIAC are frequently interviewed for news stories by print media and television media.[27]

NIAC intends to analyze, assess, publish, and disseminate to the public the information gathered through this Request through its various media channels. **The Records requested are not sought for commercial use and NIAC plans to disseminate the information disclosed as a result of this Request to the public at no cost**.

B.    *This Request concerns a matter of current exigency to the American public*

The Records requested are urgently needed to inform the public about actual or alleged government activity.[28] More specifically, the requested records seek to inform the public about the State Department's interpretation, implementation, and enforcement of the State Department "Supplemental Questions for Visa Applicants" policy with regard to nationals of Iran and other Muslim-majority countries amid numerous court orders, at least four internal memos from the Secretary of State to visa-issuing posts abroad, and other quickly developing events. Empirical data cited *supra* indicates that the State Department policy has been implemented improperly which has resulted to a 52% drop in visas issued to Iranians in April compared to last year. The requested information has a particular value which has the potential of being lost if not disseminated quickly because issues related to this policy are currently being investigated by media and are before the public.[29]

Any delay in review of the requested records would compromise the integrity of the public's confidence in the nation's institutions in connection with nationwide injunctions against an executive order that numerous courts have found likely to be unconstitutionally impermissible. A subsequent "extreme vetting" policy designed to undermine the judiciary and exploit an administrative backdoor to nevertheless drastically reduce the number of Iranians and Muslims entering the United States based on discriminatory grounds rather than bona fide threats to national security is a matter of great public interest.

---

[26] *See e.g.*, Press Release, *National Iranian American Council*, *As Trump Takes Muslim Ban to Supreme Court, Backdoor Ban Already in Place* (Jun. 22, 2017), https://www.niacouncil.org/trump-takes-muslim-ban-supreme-court-backdoor-ban-already-place/
[27] *See e.g.*, Steve Inskeep, *White House Shouldn't Try to Reverse Iran Nuclear Deal, Parsi Says*, NPR, Apr. 20, 2017, http://www.npr.org/2017/04/20/524833644/white-house-shouldnt-try-to-reverse-iran-nuclear-deal-parsi-says (interviewing NIAC President Trita Parsi).
[28] *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).
[29] *See ACLU v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 29 (D.D.C. 2004) (citing *Al-Fayed v. CIA*, 254 F.3d 300, 310 (2002) (finding "compelling need" and "urgency to inform" are determined by three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would comprise a significant recognized interest; and (3) whether the request concerns federal government activity.)

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



The requested records must be immediately released without delay so that the American public can be informed and decide for themselves whether the Trump administration is, in effect, implementing a backdoor Muslim ban irrespective of nationwide injunctions and court challenges to the president's March 6, 2017 executive order.

Given the foregoing, this request "concerns a matter of current exigency to the American public" and the "consequences of delaying a response would compromise a significant recognized interest" which "concerns federal government activity."[30] NIAC has satisfied the statutory requirement for expedited processing of this Request.

### IV. Application for Waiver or Limitation of Fees

NIAC hereby formally requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of operations or activities of the government and is not primarily in the commercial interest of the requester."[31]

NIAC also requests a waiver of search fees on the grounds that we qualify as a "representative of the news media" and the records requested are not sought for commercial use.[32]

A.  *This Request is likely to contribute significantly to public understanding of the the operations or activities of the federal government and is not primarily in the commercial interest of the NIAC*

Given the civic unrest across the country and widespread media attention to the issue of the president's executive order, ongoing litigation, and "extreme vetting" policy being implemented by the Department of State, the records sought will significantly contribute to public understanding of an issue of profound public importance. Especially because very little specific information has been made public about how the State Department's Policy will be interpreted, implemented, and enforced, the records sought are certain to contribute significantly to the public's understanding of these issues.

NIAC is not filing this Request to further our commercial interest. As described above, any information disclosed by NIAC as a result of this FOIA Request will be made available to the public at no cost. Thus, a fee waiver would fulfill Congress' legislative intent in amending the FOIA.[33]

---

[30] *ACLU,* 321 F. Supp. 2d at 29.
[31] 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 22 C.F.R. § 171.17.
[32] 5 U.S.C. § 552(a)(4)(ii)(II).
[33] *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters." (quotation marks omitted))).

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



B.   *NIAC is a representative of the news media and the records are not sought for commercial use*

NIAC also hereby formally requests a waiver of search fees on the grounds that we qualify as a "representative of the news media" and the records are not sought for commercial use.[34] NIAC meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience."[35]

Furthermore, courts have found other organizations whose mission, function, publishing, and public education activities are similar in kind to NIAC's to be "representatives of the news media" as well.[36]

On account of these factors, fees associated with responding to FOIA requests are regularly waived for non-profit public interest organizations as "representatives of the news media." Like requests made by other non-profit organizations engaged in similar activity, NIAC meets the requirements for a fee waiver here.

\*   \*   \*

Pursuant to applicable statutes and regulations, NIAC expects a determination regarding expedited processing within the proscribed 10 day period. *See* 5 U.S.C. § 552(a)(6)(E)(ii); 6 C.F.R. § 5.5(e)(4).

If the Request is denied in whole or in part, we ask that you justify all deletions by reference to specific FOIA exemptions. We expect the production and release of all segregable portions of otherwise exempt material, even if redacted as appropriate. We reserve the right to appeal a decision to withhold any information or deny a waiver of fees.

---

[34] 5 U.S.C. § 552(a)(4)(ii)(II).

[35] 5 U.S.C. § 552(a)(4)(ii)(III); *see also Nat'l Sec. Archive v. U.S. Dep't of Defense,* 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of FOIA requests); *Serv. Women's Action Network v. U.S. Dep't of Defense,* 888 F.Supp. 2d 282 (D. Conn. 2012) (requesters were determined to be members of the news media and thus qualified for fee waivers for FOIA requests to the Department of Defense and Department of Veterans Affairs).

[36] *See, e.g., Cause of Action v. IRS*, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.,* 241 F. Supp. 2d at 10-15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 133 F. Supp. 2d 52, 53-54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a representative requester of the news media.

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org



Thank you for your prompt attention to this matter. Please furnish the applicable records to:

**\*All materials sent prior to July 1, 2017 to:**

**National Iranian American Council**
**c/o Shayan Modarres, Esq.**
1411 K Street, NW
Suite #250
Washington, D.C. 20005


**\* All material sent after July 1, 2017 to:**

**National Iranian American Council**
**c/o Shayan Modarres, Esq.**
1629 K Street, NW
Suite #503
Washington, D.C. 20006


## CERTIFICATION

In support of the foregoing FOIA request, NIAC incorporated by reference herein all relevant facts and information as stated in NIAC's FOIA Request and certifies and affirms that the information provided and stated herein supporting the request for expedited processing is true and correct to the best of the undersigned's knowledge and belief. *See* U.S.C. § 552(a)(6)(E)(vi).


Respectfully,



Shayan H. Modarres, Esq.
Legal Counsel
National Iranian American Council
1411 K Street NW, Suite #250
Washington, D.C. 20005

1411 K Street NW
Suite 250
Washington, DC 20005

Tel: (202) 386-6325
info@niacouncil.org
www.niacouncil.org